**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

RONNIE KEYES,

      Plaintiff,

v.

DEPUTY U.S. MARSHAL GILLIAN FLECK, in her individual capacity;
DEPUTY U.S. MARSHAL MICHAEL THOMAS, in his individual capacity; and
USMS CASE MANAGER DAVE JONES, in his individual capacity

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Ronnie Keyes, by and through his attorneys, David Lane and Liana Orshan of

KILLMER, LANE & NEWMAN, LLP, hereby brings this Complaint and Jury Demand and alleges as

follows:

## I.    <u>INTRODUCTION</u>

1.    Ronnie Keyes is dying. An infection that he contracted while a federal pre-trial

detainee at the Aurora Detention Center, which is operated and managed by a private

corporation, The GEO Group, Inc. ("GEO"), under a contract with the federal government, is

killing him, and the doctors have told him that there is nothing more that they can do for him.

2.    The United States Marshals Service, which has custody over all federal pre-trial

detainees, made the decision to house Mr. Keyes at GEO's Aurora Detention Facility while Mr.

Keyes was awaiting trial. For months, Mr. Keyes, his family, and his criminal defense team had

complained to Defendants about the lack of adequate medical care at GEO and his deteriorating

health, but his complaints were essentially ignored.  When his condition had deteriorated to such

an extent that GEO had no choice but to take him to a hospital, the doctors at the hospital were forced to amputate his leg to try to save his life.

3.      Since the amputation, Mr. Keyes has been in and out of the hospital while the doctors try to get the infection under control, and he has had multiple surgeries. However, doctors have informed him that there is almost no way to cure the infection at this point, and he is not likely to live for much longer.

4.      Because of Defendants' unconstitutional acts and omissions, Mr. Keyes has had to endure and is continuing to endure unconscionable pain and suffering, and he likely also faces impending death.

## II.      PARTIES

5.      Plaintiff Ronnie Keyes is a citizen of the United States and was at all relevant times a resident of, and domiciled in, the State of Colorado. He currently lives at 14218 E. 1st Dr., Apt. # B12, Aurora, Colorado 80011.

6.      Under a contract with the federal government, The GEO Group, Inc. ("GEO"), a private corporation, houses federal pre-trial detainees at the Aurora Detention Facility, a detention facility it owns, operates, and manages located at 3130 North Oakland Street, Aurora, Colorado 80010.

7.      The United States Marshals Service ("USMS") is a federal law enforcement agency within the Department of Justice. The USMS has custody over all federal pre-trial detainees. The USMS made the decision to house Mr. Keyes at GEO's Aurora Detention Facility while Mr. Keyes was awaiting trial. During that time, the USMS retained custody over Mr. Keyes and had the authority to transfer Mr. Keyes elsewhere if Mr. Keyes's medical needs were being not being met at the Aurora Detention Facility.

8.      At all times relevant to the subject matter of this Complaint, Deputy U.S. Marshal Gillian Fleck ("USMS Fleck") was a citizen of the United States and a resident of Colorado. At all relevant times, USMS Fleck was acting under color of federal law in her position as a Deputy in Charge employed by the USMS, and she was responsible, among other U.S. Marshals, for evaluating whether Mr. Keyes's needs were being met at GEO's Aurora Detention Facility. USMS Fleck is named as a Defendant in her individual capacity.

9.      At all times relevant to the subject matter of this Complaint, Deputy U.S. Marshal Michael Thomas ("USMS Thomas") was a citizen of the United States and a resident of Colorado. At all relevant times, USMS Thomas was acting under color of federal law in his position as a Deputy employed by the USMS, and he was responsible, among other U.S. Marshals, for evaluating whether Mr. Keyes's needs were being met at GEO's Aurora Detention Facility. USMS Thomas is named as a Defendant in his individual capacity.

10.     At all times relevant to the subject matter of this Complaint, U.S. Marshal Service Case Manager Dave Jones ("USMS Jones") was a citizen of the United States and a resident of Colorado. At all relevant times, USMS Jones was acting under color of federal law in his position as a Case Manager employed by the USMS, and he was responsible, among other U.S. Marshals, for evaluating whether Mr. Keyes's needs were being met at GEO's Aurora Detention Facility. USMS Jones is named as a Defendant in his individual capacity.

11.     USMS Fleck, USMS Thomas, and USMS Jones are collectively referred to as the "USMS Defendants."

### III.      JURISDICTION AND VENUE

12.     This action arises under the Constitution and laws of the United States.

13.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by the Equal Access to Justice Act, 28 U.S.C.S. § 2412, and 42 U.S.C. § 1988.

14.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## IV.     STATEMENT OF FACTS

### *GEO severely neglected Mr. Keyes's medical needs, with dire consequences for Mr. Keyes's health.*

15.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth therein.

16.     Plaintiff Ronnie Keyes was born October 20, 1977, in Joliet, Illinois. He moved to Colorado in approximately 2009 to be closer to his family members, many of whom had relocated to the Denver area.

17.     Mr. Keyes is the oldest of eight brothers. He was the first born grandchild on both sides of the family. Mr. Keyes has a very close relationship with his brothers and his mother, and he has a large extended family. Mr. Keyes also has eight children from the ages of approximately fourteen to twenty-four.

18.     In 2006, Mr. Keyes was in a severe car accident, which caused him to become paralyzed. As a result, Mr. Keyes cannot walk, and he uses a wheelchair for mobility.

19.     In June 2016, Mr. Keyes was charged with a federal crime. Pending trial, he was detained—by choice of the USMS—at the Aurora Detention Facility, which is operated and managed by GEO under a contract with the federal government.

20.     Because of Mr. Keyes's condition, he has certain health complications and specific medical needs. However, before his detention at the Aurora Detention Facility, Mr. Keyes was doing well and was relatively healthy. When he arrived at the Aurora Detention Facility, he informed Warden Johnny Choate, Chief of Security Jamie Davis, Dr. Jeffrey Peterson, and Scott Vineyard, the Health Services Administrator, of what he required to stay healthy.

21.     Due to his paralysis and limited mobility, Mr. Keyes is prone to developing pressure ulcers (also called bedsores). To minimize the risk of pressure ulcers, Mr. Keyes sleeps on an air mattress, which puts less pressure on his skin than other mattresses.

22.     Mr. Keyes repeatedly requested an air mattress from GEO—and he and his family members and criminal defense team expressed concerns to the USMS Defendants that he did not have an air mattress at the GEO facility—but he was never provided with one. As a result, he began to develop pressure sores, and the pressure sores he had when he arrived got worse.

23.     When Mr. Keyes began his detention, he only had two pressure ulcers, neither of which was an open wound. Mr. Keyes requested wound care supplies to treat the ulcers, but his family was never given permission to bring him the supplies he needed, despite Mr. Keyes's stated concerns that the medical unit at the facility was not equipped to take care of the ulcers. He also asked if his personal wound care nurse could come to the facility to treat the pressure ulcers, but he was told that she could not.

24.     It soon became apparent to Mr. Keyes that GEO's medical treatment was woefully inadequate.

25.     From Mr. Keyes's arrival at the Aurora Detention Facility in June to when he was taken to the hospital in September, he filed over fifty (50) written complaints or grievances regarding his medical treatment. Not one was taken seriously.

26.     For instance, in early July, Mr. Keyes filed several grievance and medical complaint forms stating that his pressure ulcers were getting worse and there was a new one on his back, raising concerns about the procedures used by GEO medical staff to treat the ulcers, which he referred to as wounds, and listing the medical supplies he needed to treat wounds. He also noted that a high protein diet was essential for the wounds to heal, and yet he was being provided diet meals. Mr. Vineyard responded that his concerns had already been "adequately addressed."

27.     In many of his complaints, Mr. Keyes brought up concerns about Dr. Peterson. On July 7, Mr. Keyes wrote a grievance to Warden Choate stating that Dr. Peterson ordered the dressing on his wounds changed every three days, but in fact, his wounds needed to be cleaned and the dressing changed every day. On July 19, Mr. Keyes wrote to the Warden that he had put in numerous grievances about Dr. Peterson and the constant deterioration of his wounds, but he had gotten no response. He, again, received no response.

28.     Mr. Keyes repeatedly expressed in many of his complaints to the Warden and to Mr. Vineyard that his wounds needed daily care. He repeatedly expressed concerns that his wounds were getting worse. As to the pressure ulcers he had when he arrived at the Aurora Detention Facility, he noted on July 10 that one of them, which was "a scab away" from being healed, had become a complete "hole," referring to the crater formed by pressure ulcers when they start to become more severe.

29.     Mr. Keyes also complained that the nurses were not trained in wound care, and he had concerns about some of their techniques. He noted the potential for contamination of his wounds when the proper techniques were not used, and the possibility of infection.

30.     Indeed, the nurses were not competent to treat Mr. Keyes's wounds, a fact which three of the nurses told him themselves. They told him that they had never dealt with wounds like his, and the medical unit at the Aurora Detention Facility was not the place for him to get the treatment he needed.

31.     Mr. Vineyard responded to such concerns by writing to Mr. Keyes that all of the nurses were qualified to provide wound care. Mr. Vineyard, however, never responded to any of Mr. Keyes's concerns about his wounds worsening. Dawn Ceja, the Assistant Ward of Operations, reviewed Mr. Vineyard's response and signed off on it, as she did for all of Mr. Vineyard's written responses to Mr. Keyes's complaints.

32.     As a result of Dr. Peterson's refusal to order that the dressings covering Mr. Keyes's wounds be changed more frequently and that correct supplies be used to treat the wounds, the nurses' inadequate sterilization and contamination prevention techniques, and GEO's refusal to provide Mr. Keyes an air mattress, his wounds deepened and became severely infected.

33.     At the end of July, Mr. Keyes started to become more desperate. He wrote a grievance to the Warden, asking, "are you not the person to speak with about my issues? . . . My wounds are worsening and my strength is become insufficient." In the "Relief Sought" section of the grievance, Mr. Keyes simply wrote, "HELP."

34.     Mr. Keyes's mother, Rosezina Keyes, wrote a letter to the Warden also at the end of July, stating that all of Mr. Keyes's medical conditions had gotten worse since his detention.

She stated that the onsite doctor—which was Dr. Peterson—refused to adhere to Mr. Keyes's prior treatment requirements, and lack of specialized treatment would lead to further deterioration of his medical condition. She requested that Mr. Keyes be moved to another facility if his needs could not be met at the Aurora Detention Facility. Like Mr. Keyes's complaints, Mrs. Keyes's plea was essentially ignored.

35.     In August, Mr. Keyes began asking repeatedly to go to a hospital. Although some of his complaints related to severe pain in his back (he had had back surgery after the car accident and, unsurprisingly, GEO refused to provide him with what he needed to minimize strain on his back), many related to his pressure ulcers. He constantly brought up the failure to provide him with an air mattress, which caused his wounds to get worse. He also repeatedly mentioned the failure to tend to his wounds with adequate frequency and to use the correct supplies to treat them.

36.     For example, on August 16, Mr. Keyes wrote a grievance to the Warden and a medical complaint that he needed to go to the hospital for his wounds and his back pain. He explained that the pressure ulcers on his back had become a "knot" and were about to become a "hole."

37.     On August 17, Mr. Keyes wrote in a grievance that he wanted to move out of the medical ward because his "asking for help" was becoming an issue and the dressing on his wounds were not being changed every other day like they should have been. Jamie Davis, the Chief of Security, wrote a memo to Kevin Martin, the Programs Manager, and copied the Warden and Assistant Warden, stating Mr. Keyes would be moved at his request but the "issue regarding wound care [had] been noted in previous grievances through the medical department and [would] be handled by that department."

38.     In the second half of August, Mr. Keyes started to raise concerns that the ulcers had gotten even worse, they were bleeding, and they smelled bad. He repeatedly noted that the sole extent of Dr. Peterson's response to concerns about his wounds—raised by him *and* the nurses—was to give him an antibiotic and instruct the nurses to keep doing a "wet to dry" dressing. In fact, what Mr. Keyes probably needed was debridement (removal) of the dead tissue in the wounds, or at the very least, wound care directed by someone with special knowledge regarding treating pressure sores.

39.     By this point, the wound on Mr. Keyes's ankle was a crater, and the issue inside was complete black. The wound had also begun to connect to a new pressure ulcer on the back of his heel, which meant the wounds were rapidly deteriorating.

40.     Over and over again, Mr. Keyes asked to go to the hospital. In response to several of Mr. Keyes's written complaints, Mr. Vineyard wrote to Mr. Keyes on August 24 a list of every date when some type of medical services were provided to Mr. Keyes and a description of the treatment. The list looked like this: "on 6/30/16 you were evaluated by a provider on 7/1/16 wound care was provided, on 7/4/16 wound care was provided and an EKG was performed," and so on. Mr. Vineyard concluded by stating "[i]t appears your assertions [that nothing is being done to address your medical concerns] are baseless."

41.     On August 21, Mr. Keyes wrote in a grievance that his ankle wounds were worse because they were not being tended to properly, and he needed to go to the hospital or at least have an air mattress. He also noted the smell of the wound on his buttocks. His grievance was marked "Rejected."

42.     At the end of August, Mr. Keyes wrote four grievances, each stating he needed to go to the hospital. He noted that three nurses had told Dr. Peterson that Mr. Keyes needed

hospital care for the ulcers, the pressure ulcers smelled and were in terrible shape, and the United States Marshals (who have custody over all federal pre-trial detainees) needed to be alerted.

43. In response, Mr. Martin wrote that Mr. Keyes's requests to go to the hospital were "being rejected."

44. Mr. Keyes appealed the failure to provide him with an air mattress and the refusal to send him to the hospital, writing that the "entire back of [his] boxers [was] red from drainage of blood" from the wound on his back. His appeals were denied.

45. On August 29, Mr. Keyes wrote in a medical complaint that Chief Davis and Assistant Warden Ceja had seen his wounds being dressed. Yet, neither took any action to obtain much needed help for Mr. Keyes.

46. During this time period, Mrs. Keyes went to visit Mr. Keyes at the Aurora Detention Facility. She saw that his toes were turning purple. She requested for him to be brought to the hospital, but her request was denied.

47. Finally, after Mr. Keyes had a high fever for several days, staff at the facility found him passed out in his wheelchair. He was taken to the emergency room at the hospital.

48. Mr. Keyes told the emergency room doctor that the wound to his ankle had been infected for weeks, he had had a high fever, headache, and chills for three days, and the nurses at the jail only changed his dressing about every three days.

49. The doctor's initial description of Mr. Keyes's wounds was the following:

> Sacral decubitus ulcer [pressure ulcer] 6x7 cm circular lesion with . . . purulent [pus] drainage. LLE [left lower extremity] necrotic 3x4cm circular lesion with obvious purulent drainage. . . . 2x3 cm open wound with purulent drainage to lateral heel. Medial malleolus with 2x2 cm circular necrotic lesion.

50. Mr. Keyes was admitted to the hospital and diagnosed, among other things, with sepsis—infection of the blood—and osteomyelitis—infection of the bone—of the ankle and foot. Sepsis and osteomyelitis are complications that occur with severe pressure sores.

51. On September 20, Mr. Keyes had his left leg amputated below the knee in an attempt to prevent the infection from spreading further.

52. The post-operation diagnosis of Mr. Keyes's leg found "chronic ankle wounds" that were "malodorous" with "exposed bone."

53. After the amputation, Mr. Keyes was extremely depressed. Staff at the hospital noted that he experienced an acute severe grief response, and he could not look at the remainder of his left leg for a week.

54. On September 27, the pressure ulcer of Mr. Keyes's sacral region was surgically debrided (the damaged tissue was removed). The surgeon "excis[ed] . . . 12x14 cm of skin and necrotic subcutaneous tissue to the level of the sacrum." The ulcer was "malodorous, with overlying eschar [dead tissue], [and] purulent discharge."

55. On October 6, Mr. Keyes was discharged from the hospital and sent back to the Aurora Detention Facility. When he returned, Dr. Peterson apologized to him for not listening to his concerns more. Dr. Peterson told him that he had prejudged him because of his criminal history.

56. After continuing medical complications, the case against Mr. Keyes was dismissed because of health concerns and he was released from custody.

57. In the months since, Mr. Keyes has been in and out of the hospital, battling sepsis and osteomyelitis from infections to the wound in his sacral region. Mr. Keyes has seen numerous doctors and had multiple procedures, but he has been informed that there was nothing

more that could be done to try to rid him of the infection. Although he has recently had multiple surgeries to try to manage the infection, doctors have told him that he likely does not have much longer to live.

### ***Despite being aware of the substantial risk that GEO was not meeting Mr. Keyes's medical needs, the USMS Defendants deliberately failed to intervene to ensure that Mr. Keyes was provided constitutionally adequate healthcare.***

58.     Per the USMS prisoner healthcare standards, the USMS has the authority to acquire and pay for reasonable and medically necessary care (to include emergency medical care) to ensure the wellbeing of all pre-trial detainees under the custody of the USMS.

59.     Yet although Mr. Keyes, his family members, and his criminal defense team repeatedly informed the USMS Defendants that GEO was not meeting his medical needs, a fact that the USMS Defendants also would have learned from the USMS deputies who several times escorted Mr. Keyes to court appearances at which his attorney specifically described how Mr. Keyes's needs were being neglected, the USMS Defendants continually refused, until it was too late, to transfer Mr. Keyes to a hospital or another detention facility that could better meet his needs.

60.     Starting the day he was arrested, June 24, 2016, the USMS housed Mr. Keyes at GEO's Aurora Detention Facility, which USMS Fleck specifically represented was the best place for Mr. Keyes given his medical condition.

61.     When the USMS designated Mr. Keyes to the Aurora Detention Facility, the USMS and the USMS Defendants were aware that Mr. Keyes was in a wheelchair and not capable of walking or standing, and that he had "extensive medical needs." In light of this knowledge, the USMS could have assigned Mr. Keyes to one of the detention facilities operated by the federal Bureau of Prisons ("BOP") for inmates with serious or chronic medical problems.

Instead, the USMS sent Mr. Keyes to a facility owned and operated by GEO, a company with a widely known and documented history of failing to provide adequate medical care to inmates at its facilities.

62.     Within the first week Mr. Keyes spent at the Aurora Detention Facility, it became clear to his defense team that GEO was not meeting, and was not able to meet, Mr. Keyes's medical needs.

63.     At Mr. Keyes's June 29th detention hearing, his defense attorney informed the court that GEO had not been providing the care that Mr. Keyes needed, and his attorney did not believe GEO had the capacity to provide such care. Specifically, Mr. Keyes's attorney explained that to his knowledge, Mr. Keyes had only been receiving three medications, which was nowhere near the number of medications he needed, and, particularly, Mr. Keyes had not been receiving his pain medication and therefore was in constant pain; Mr. Keyes had not been receiving an inhaler, which he needed because of a collapsed lung from the car accident; Mr. Keyes was not being rotated every two hours, which was necessary because of bed sores; and Mr. Keyes had not been able to do pressure releases every ten to fifteen minutes, also necessary because of bed sores.

64.     At the June 29th hearing, Mr. Keyes's attorney further explained that Mr. Keyes's spine was deteriorating; he had a history of urinary tract infections and needed a catheter that had to be changed daily; and before he was arrested, he had a wound nurse who treated his bed sores every other day, he went to therapy two to three times a week, and he got skin massages to help prevent bed sores. Given these substantial needs, Mr. Keyes's attorney expressed grave concerns that GEO could provide Mr. Keyes adequate care.

65.     Despite Mr. Keyes's medical needs, the court refused to grant Mr. Keyes release on bond. Moreover, although USMS deputies had escorted Mr. Keyes to court, and therefore heard Mr. Keyes's attorney's concerns about GEO's providing Mr. Keyes adequate medical care, the USMS did not transfer Mr. Keyes to a facility better equipped to care for his needs, nor do anything to ensure GEO started providing adequate care.

66.     Specifically, none of the three USMS Defendants, who, upon information and belief, were each involved in the decision-making regarding Mr. Keyes's custody placement, took any action in response to Mr. Keyes's attorney's statements at the hearing, although they all would have known about Mr. Keyes's attorney's expressed concerns from the deputies present at the hearing or otherwise.

67.     Thus, Mr. Keyes continued to be detained at the Aurora Detention Facility, and throughout the next two-and-a-half months of his detention (the period before he landed in the hospital and had his leg amputated), he, his defense team, and his family repeatedly raised concerns to the USMS Defendants about GEO's failure to provide him needed medical care.

68.     For instance, on July 5, 2016, Mr. Keyes submitted a grievance directed to USMS Jones stating that he was having an issue with his medications and a high protein tray. On July 10, Mr. Keyes submitted another grievance to USMS Jones; he wrote that he needed to speak with him ASAP and that his requests were being ignored. The response: "I gave you your options about your request." Upon information and belief, USMS Jones, took no steps, or took clearly inadequate steps, to address Mr. Keyes's concerns.

69.     On July 6th, Mr. Keyes spoke with USMS Thomas about GEO's not having the proper medical supplies to treat Mr. Keyes's wounds. USMS Thomas responded that it was a

financial issue. He then told Mr. Keyes that, from a medical perspective, he was in the best place for him.

70.     On July 7th, Mr. Keyes's father contacted Mr. Vineyard, expressing concerns that GEO was not taking care of Mr. Keyes's medical needs and did not have the medical supplies Mr. Keyes needed. Mr. Keyes's father's concerns were passed on to USMS Fleck and USMS Thomas. Upon information and belief, neither inquired into whether Mr. Keyes's concerns were justified.

71.     Also on July 7th, an investigator working for Mr. Keyes's attorney called USMS Fleck with concerns about Mr. Keyes's medical care at GEO. Specifically, the investigator informed USMS Fleck that Mr. Keyes had the following needs that GEO was not meeting: an inhaler for breathing issues, pain medications for chronic pain, enough catheters, and frequent enough wound care.

72.     USMS Fleck contacted Dr. Peterson, who essentially told her that per Mr. Keyes's medical records, Mr. Keyes was receiving the medical supplies and treatment that was indicated as necessary by his records. USMS Fleck conveyed this information to Mr. Keyes's investigator and also told her that GEO was the best facility they had for medical treatment and Mr. Keyes was getting as much treatment as possible.

73.     Upon information and belief, USMS Fleck did not take any further action in response to the investigator's concerns, such as contacting Mr. Keyes's regular medical providers (those he saw before he was arrested) to ensure that what Dr. Peterson told her about Mr. Keyes's needs was, in fact, an accurate statement of such needs. Nor did USMS Fleck speak to any other staff at GEO to confirm Dr. Peterson's representations.

74.     On July 11th, Mr. Keyes's investigator emailed USMS Fleck with some additional concerns about Mr. Keyes's medical issues. The investigator explained Mr. Keyes had a pretty severe open wound on his ankle, which actually was a hole measuring approximately 2 cm deep. The investigator specifically listed supplies that seemed necessary to treat the wound but that apparently GEO did not have. The investigator also expressed concerns that, among other things, the dressings on Mr. Keyes's wounds were not being changed frequently enough and he was not being given anything stronger than ibuprofen to treat his severe pain.

75.     USMS Fleck responded that GEO, like all USMS contract facilities, was permitted to use only certain medications, which is why the supplies the investigator listed were not being used. USMS Fleck further stated that an inmate could not be provided opioids or narcotics to use for pain "as needed," which was what, according to Mr. Keyes's medical records, he had been prescribed before taken into custody. Additionally, USMS Fleck again relied solely on Dr. Peterson's assurances that the wound care GEO provided Mr. Keyes was adequate.

76.      On July 29th, USMS Jones received a letter written by Mr. Keyes's mother on July 25th expressing significant concerns about the medical care GEO provided Mr. Keyes, and in particular, the on-site physician's failure to provide adequate treatment to Mr. Keyes.

77.     Upon information and belief, other than forwarding the letter to Warden Choate, Assistant Warden Ceja, Mr. Vineyard, and Chief Davis, USMS Jones took no action in response to Mr. Keyes's mother's letter, such as investigating whether her complaints were justified, or any actions he did take were patently unreasonable in relation to the seriousness of the allegations.

78.     On August 23rd and 24th, Mr. Keyes's investigator contacted USMS Fleck and USMS Thomas with updated concerns about his medical care, which included that the bandages for his wounds were not getting changed frequently enough and he had new pressure wounds—as a result of not getting an appropriate mattress—that looked "pretty bad."

79.     USMS Thomas's response essentially amounted to representations that he was under the impression Mr. Keyes's medical care was adequate, and even better than what he was receiving when he was not in custody; Mr. Keyes only complained about his medical care because he just did not like being in custody; and Dr. Peterson was very frustrated with Mr. Keyes because of all the complaints. USMS Thomas again assured the investigator that the GEO facility was the best place, medically, for Mr. Keyes.

80.     USMS Fleck's response to the investigator's latest concerns was to again contact Dr. Peterson. Apparently satisfied with Dr. Peterson's responses to the concerns raised, USMS Fleck merely conveyed such responses to the investigator. Upon information and belief, USMS Fleck took no action to verify the accuracy of Dr. Peterson's information, or to ensure that the care Dr. Peterson said was being provided to Mr. Keyes was indeed adequate.

81.     On August 30th, Warden Choate emailed USMS Fleck that Mr. Keyes's mother continued to call with the same complaints regarding wound care and infection. USMS Fleck responded that she had also heard from Mr. Keyes's mother and "Dr. Peterson has been excellent at keeping [her] informed of Keyes' situation and will be sending yet another email about everything he's complained about lately and how it is inaccurate."

82.     But apparently Mr. Keyes's complaints about his deteriorating health could not have been that inaccurate, because two weeks later he was in the hospital having his foot amputated.

83.     During and after Mr. Keyes's hospitalization, USMS Fleck finally started to express some concerns about GEO's ability to meet Mr. Keyes's need. In an October 5th bond hearing (Mr. Keyes's attorney and the United States attorney filed a joint motion requesting that Mr. Keyes be released on a personal recognizance bond), USMS Fleck testified that while she believed GEO was able to originally meet Mr. Keyes's medical needs, GEO was no longer able to do so.

84.     Yet, when Mr. Keyes was released from the hospital in early October, the USMS sent him back to GEO. USMS Fleck emailed Mr. Keyes's investigator on October 11th regarding the fact that Mr. Keyes had been placed back at the GEO facility; in her email, USMS Fleck explained Mr. Keyes would stay at GEO because GEO said they could provide the medical treatment that his doctors at the hospital said he needed.

85.     On October 13th, Mr. Keyes was again admitted to the hospital. On October 31st, USMS Fleck informed Ronnie's attorney and investigator that she had just been notified that his condition had worsened and he was likely dying.

86.     Mr. Keyes remained in the hospital until mid-November, when the United States agreed to dismiss the charges against him.

87.     USMS Fleck's, USMS Thomas's, and USMS Jones's failure to take anything but a cursory look into the repeated complaints from Mr. Keyes, his family, and his criminal defense team about the medical care he was receiving from GEO constituted a deliberate choice to ignore the substantial risk that GEO was not meeting his serious medical needs.

88.     Rather than make any real effort to investigate whether any of Mr. Keyes's complaints were justified, the USMS Defendants relied exclusively on GEO's representations that Mr. Keyes was receiving adequate medical care.

89.     However, in light of GEO's long and well-known history of failing to provide adequate medical care to detainees at its facilities, with which the USMS Defendants were undoubtedly familiar, it was patently unreasonable for the USMS Defendants not to take any further steps to determine whether Mr. Keyes's medical needs were being met.

90.     For years, GEO's ability to provide adequate medical care to detainees in its facilities across the country (and in other countries) has been seriously questioned. For instance, in 2012, the Department of Justice's Civil Rights Division reported that detainees at a youth correctional facility run by GEO in Mississippi were not receiving constitutionally adequate care, and specifically found that the facility was deliberately indifferent to the serious medical needs of the youth.

91.     Similarly, a September 2015 report by the United States Commission on Civil Rights found that certain GEO facilities were not complying with basic medical standards set by the government regarding providing healthcare to detainees.

92.     The Commission pointed to several examples of inmates being denied adequate medical care at GEO facilities, including a forty-six-year-old man detained at a GEO-operated facility in Denver who died of a heart attack in April 2012 after the facility, according to a report by the ICE Office of Detention Oversight ("ODO"), failed to provide him access to emergent, urgent, or non-emergent medical care. The ODO further found that GEO's failure to properly train its nursing staff played a significant role in the detainee's death.

93.     The Commission also discussed the April 2015 death of a detainee at a GEO facility in California who died three days after he was admitted to the hospital and diagnosed with cancer. The inmate had displayed "alarming" signs for three weeks before his death, but medical staff never provided him any treatment.

94.     According to a 2015 Huffington Post article—which states that GEO has been the subject of hundreds of lawsuits, ranging from sexual battery to medical neglect to wrongful death—a government report found that GEO's medical mismanagement at the same facility directly led to the death of at least one detainee in March 2012. And, the American Civil Liberties Union ("ACLU") and nine other legal service providers and human rights organizations formally voiced concerns about the poor quality of health care offered at the facility, emphasizing abhorrent accounts of medical negligence.

95.     The ACLU also drafted a report in June 2014 explaining that because GEO is responsible for the costs of providing medical services to detainees, it has perverse incentives to limit costs by reducing medical staff and withholding treatment to maximize profit.  The ACLU stated that it was "gravely concerned" about the ability of some private prisons such as those run by GEO to provide timely care in urgent situations, and it had heard numerous reports of prisoners at such facilities being denied both urgent treatment and routine preventative care, as well as prisoners with chronic diseases receiving inconsistent treatment. The ACLU noted that the BOP itself found the medical care at at least one GEO-run facility in Texas inadequate, with the lack of healthcare greatly impacting inmate health and well-being.

96.     That GEO facility in Texas was the site of a riot in 2009 due partly to poor healthcare; it occurred after an inmate with epilepsy died of a seizure in solitary confinement. There were signs that the inmate had not received any recent medical attention before his death. In its 2014 report, the ACLU reported that inmates at the same facility continued to complain of the grave lack of medical.

97.     Other nonprofit watchdog organizations—Grassroots Leadership and the Center for Media and Democracy's SourceWatch—have issued reports in the last few years about the

lack of adequate healthcare at GEO's detention facilities. SourceWatch explained that one of the primary critiques of for-profit prison operators, like GEO, is that profit-focused measures lead to negative consequences such as the withholding of medical care.

98.     But financial considerations do not just form a basis for GEO's decisions regarding medical care for detainees, they also play a role in the USMS's decisions regarding the same. Although GEO is responsible for medical costs for care inside its facilities, the USMS is responsible for paying for medical care when a detainee must go to a medical facility, like a hospital, in the community. These sorts of considerations may have played a role in the USMS Defendants' decisions to leave Mr. Keyes at the Aurora Detention Facility despite his known serious medical needs instead of moving him to a medical facility.

99.     However, regardless whether cost was a consideration in the USMS Defendants' failure to seriously address Mr. Keyes's, his family's, and his attorney team's concerns about the medical care GEO was providing him, given the repeated and consistent complaints and GEO's history of failing to provide adequate medical care to detainees, it was obvious that there was a substantial risk Mr. Keyes's serious medical needs were not being met.

100.     The USMS Defendants thus knew about such risk, yet they deliberately, recklessly, and—in light of GEO's history—unjustifiably chose to take GEO's representations about Mr. Keyes's medical situation at face value instead of independently determining whether GEO was providing adequate care. In doing so, the USMS Defendants were deliberately indifferent to Mr. Keyes's serious medical needs, and they are responsible for the dire consequences to Mr. Keyes's health that occurred as a result.

## V.   CLAIM FOR RELIEF

**Violation of the Fourteenth Amendment to the United States Constitution – Deliberate Indifference to Serious Medical Needs**

101.   Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

102.   This claim is brought under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

103.   The USMS Defendants were federal officials acting under the color of federal law in their actions and inactions at all times relevant to this Complaint.

104.   From his arrest on June 24, 2016, to his release from custody after the charges against him were dismissed on November 16, 2016, Mr. Keyes was a pre-trial detainee for purposes of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

105.   Mr. Keyes, as a pre-trial detainee, had a Due Process right under the Fourteenth Amendment to be free from deliberate indifference to his known, serious medical needs.

106.   Due to his paraplegia and associated medical conditions and complications, as well as his deteriorating health as his detention progressed, Mr. Keyes had a serious medical need from June through November 2016. Mr. Keyes's medical needs were diagnosed by a physician as mandating treatment, and his needs were also so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

107.   The USMS Defendants' failure to intervene in the medical care GEO was providing to Mr. Keyes, either by ensuring that GEO was in fact providing adequate medical care to Mr. Keyes or by transferring Mr. Keyes somewhere that could meet his medical needs, created a substantial risk of serious harm because it was highly probable that failure to provide

proper care for Mr. Keyes's condition would cause Mr. Keyes serious injury, substantial suffering, and/or death.

108.   The actual harm suffered because the USMS Defendants failed to intervene in the medical care GEO was providing Mr. Keyes, including the amputation of one of his legs, multiple surgeries and operations, severe pain and suffering, and probable death, is substantial.

109.   In light of the repeated concerns raised by Mr. Keyes, his family, and his criminal defense team, as well as the fact of GEO's known history of failing to provide adequate medical care to detainees at its facilities, it was obvious that failure to ensure that Mr. Keyes was receiving adequate care posed a substantial risk of serious harm, and ensuring Mr. Keyes was receiving such care entailed more than relying solely on GEO's representations. Thus, the USMS Defendants knew that their failure to take any action other than asking GEO if Mr. Keyes's medical needs were being met posed a substantial risk of serious harm.

110.   Despite their knowledge that there was a substantial risk of serious harm to Mr. Keyes if they did not take appropriate action to ensure his medical needs were being met, the USMS Defendants deliberately chose not to take such action. The USMS Defendants therefore recklessly disregarded the obvious and substantial risk of serious harm to Mr. Keyes created by their failure to take appropriate action to ensure that his medical needs were being met, and they thereby acted with deliberate indifference to his constitutional right to receive adequate medical care.

111.   Existing law at the time of Mr. Keyes's detention clearly established that the deliberate indifference of a federal official with custody over a detainee to the detainee's known, serious medical needs violates the Due Process Clause of the Fourteenth Amendment. In light of existing law, the USMS Defendants knew or reasonably should have known that their actions

and inactions with respect to Mr. Keyes's medical needs, which were taken under color of federal law, violated this clearly established constitutional right.

112.    But for the acts and omissions of the USMS Defendants, Mr. Keyes would not have been subjected to the deprivation of his constitutional right to receive adequate medical care, and such a deprivation was a natural and foreseeable consequence of the USMS Defendants' acts and omissions.

113.    As a direct and proximate cause and consequence of the USMS Defendants' conduct, Mr. Keyes has suffered and continues to suffer severe injuries and damage to his health and extreme physical and mental pain and suffering.

114.    As a result of the USMS Defendants' conduct, Plaintiff has suffered and continues to suffer economic and noneconomic damages, losses, and injuries, in an amount to be determined at trial. General and compensatory damages to which Plaintiff is entitled include, inter alia, pain and suffering, impairment in the quality of life, upset, anger, depression, and all other damages as allowed under law.

115.    Mr. Keyes is also entitled to punitive damages against the USMS Defendants because their acts and omissions were taken maliciously, willfully, or with reckless or wanton disregard of Mr. Keyes's constitutional rights.

### VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, in an amount to be determined by a jury following a trial, and award him all relief allowed by law, including, but not limited to, the following:

a.    Appropriate and equitable relief including but not limited to declaratory and

injunctive remedies;

b.      Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c.      Punitive damages for all claims allowed by law in an amount to be determined at trial;

d.      Pre-judgment and post-judgment interest at the highest lawful rate;

e.      Attorney fees and case costs;

f.      Such further relief as justice requires or the law allows.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ISSUES SO TRIABLE.**

Respectfully submitted this 1st day of May, 2017.

KILLMER LANE & NEWMAN, LLP

*s/* David A. Lane
David A. Lane
1543 Champa Street, Ste. 400
Denver, CO 80202
dlane@kln-law.com